CASE 55—PETITION EQUITY—MAY 9.

# Supreme Lodge Knights and Ladies of Honor v. Owens, &c.

APPEAL FROM LOUISVILLE LAW AND EQUITY COURT.

TRUSTS—CONTRIBUTIONS FOR CYCLONE SUFFERERS.—The supreme lodge of a benevolent society having, in response to a "distress call" which it had sent out, received contributions from subordinate lodges for the relief of the families of members of the order who had suffered by a cyclone, it had no right to withhold from distribution any part of the fund thus contributed, the persons for whose benefit it was contributed having the right to the whole. And this is true, although the number of persons injured and the extent of their injuries were less than was estimated in the call, there being no such disproportion between the estimates made by the call and the actual facts as to amount to fraud or mistake.

HUMPHREY & DAVIE AND JAMES A. BEATTIE FOR APPELLANT.

1. The moneys sent to the supreme lodge in response to the distress call did not belong to those who were injured, but were simply sent to the supreme lodge to put it in funds so that it could apply them, as it could any other funds it had, in the manner that, in the judgment of its committee, should appear necessary to relieve the distress. (Pulpress v. M. E. African Church, 48 Pa. State, 209; Ould v. Washington Hospital, 95 U. S., 311; Attorney-General v. Wallace, 7 Ben. Monroe, 617–620.)

Supreme Lodge Knights and Ladies of Honor v. Owens, &c.

2. There being no charge that the committee of the supreme lodge working on the spot acted in bad faith, its judgment was final, and will not be disturbed by the courts. (Supreme Lodge v. Owens, 14 Ky. Law Reporter, 199; Van Poucke v. Netherland. 63 Michigan, 378; Fritz v. Munch, 62 Howard's Practice, R. 70; Niblack on Benevolent Societies, sec. 364.)

3. The surplus fund belonged to the donors, and in the absence of their calling for it, it would be implied that the donors desired the supreme lodge to keep it, to be used, in its judgment, when some future emergency should arise calling for benevolence. (Niblack on Benevolent Societies, sec. 150.)

LEWIS N. DEMBITZ and E. S. WATTS for appellees.

1. The trust is in favor of a few ascertainable men and women who suffered by the cyclone. It is not a "charity" in its technical sense, but a private trust or benevolence. (Babb v. Reed, 5 Rawle, 151; Niblack Mut. Ben. Soc., sec. 138.)

2. The court will interfere when there is some failure or incapacity on the part of the trustee to act, or where there has been some abuse of trust. There is no discretion of a trustee which a chancellor can not control when it is abused. (Davey v. Ward, L. R. 7 Ch. Div., 754; Re Roper's Trustee L. R., 11 Ch. Div., 272.)

3. Discretion may be controlled by a court of equity, at least to this extent, that the trustee or executor will be compelled to exercise it in some way. (Bull v. Cromie, 81 Ky., 651; Bohon v. Barret, 79 Ky., 378; Berry v. Hamilton, 10 B. M , 129.)

4. If the officers of an incorporated society are about to apply its fund or credit to other purposes than those specified in the charter, a court of equity will interfere by injunction at the instance of one of the members. (Niblack Mut. Ben. Soc., sec. 135; Reeve v. Parkins, 2 Jac. & W., 390.)

CHIEF JUSTICE BENNETT delivered the opinion of the court

The Supreme Lodge Knights and Ladies of Honor is an institution organized to promote benevolence and mutual protection and assistance. Besides the Supreme Lodge, it has a number of subordinate lodges. On the night of the 27th of March, 1890, the city of Louisville was visited by a terrible cyclone, which killed and injured a great many persons, and destroyed and damaged a great deal of property. One

of the subordinate lodges in the city of Louisville was known as Falls City Hall. About one hundred and twenty-five of its members and friends were assembled in the hall that night to transact the business of the order; and while they were in the hall for that purpose it was demolished by the cyclone, killing, it was supposed, about forty members, and injuring as many more. On the 29th of the same month, just two days after the sad occurrence, John T. Millburn, the Supreme Protector and presiding officer of the Supreme Order, issued the following distress call to all other lodges of the same order:

"The sad but important duty of laying before you briefly the facts of one of the most unfortunate calamities that has ever befallen our order imposes itself upon me. On the evening of the 27th of March, 1890, a cyclone visited the city of Louisville, Kentucky, passing from a south-eastern portion in a north-western direction, a distance of about two miles, in width about four squares, destroying every thing in its path. Neither tongue nor pen can convey a correct idea of the devastation and suffering that has followed its track.

"It is not my purpose to enter into details, as that which concerns you and the members directly, is the misfortune that befell the visitors and membership of Jewell Lodge No. 2, Knights and Ladies of Honor, which, at the time, was in session at the hall between Eleventh and Twelfth streets on Market street, known as Falls City Hall, a large three-story building, which is utterly demolished, and nearly every thing and everybody in it were victims of the

calamity. Jewell lodge room was situated in the third story of the building. It was an occasion on which one hundred and twenty-five to one hundred and thirty members were present. There were present for initiation eighteen candidates. The lodge had just gotten fairly to work when it went down in a heap of ruin. All is yet confusion. A corps of laborers has been engaged ever since the accident, excavating and removing the debris, and removing dead bodies. I can safely say, with the committee whom I appointed, composed of Supreme Trustees (naming them), that no less than forty members have been killed, and nearly as many injured, leaving many families and members in sore distress, which can be materially comforted and relieved by prompt assistance. I, therefore, place before you briefly the foregoing facts, without attempting to give the details, as it would require more time and space than the circumstances in this shape would permit, and I call upon you for aid and assistance to relieve the suffering of our brethren, their families and dependants. This matter is one that is addressed to your sympathy and fraternal love. Prompt and immediate action is absolutely necessary. And I feel called upon to say no more on the subject. The committee before referred to will be continued. The Grand Protectors of the several jurisdictions will please report this call to their subordinate lodges. Send all remittances to the Supreme Secretary, C. W. Harvey, Indianapolis, Ind., who will acknowledge receipt of same in the next number of the Intelligencer, and upon proper order the same will be

turned over to the proper committee for disbursement among the members and their families in distress." It turned out that instead of forty persons being killed, only twenty-two were killed, and thirty-six or more were more or less injured, and several of the injured persons afterwards died of their injuries.

Four thousand nine hundred and fifty-six dollars were sent in in response to this call. The secretary kept back about two thousand eight hundred and thirteen dollars, and instead of sending it to the committee covered it into the treasury of the Supreme Lodge. And the committee returned to the secretary twenty-two dollars of the sum confided to them for distribution among the members and their families, and dependants mentioned in the distress call, making two thousand eight hundred and forty-one dollars covered into the treasury of the Supreme Lodge. The committee distributed said sum among fifty-eight persons, filling the description of the. object of the bounty named in the distress call. The committee made said distribution and disbanded before the middle of May. The amount received under the distress call was not published or made known to the committee until it appeared in the Intelligencer for July. The said sufferers feeling that they were entitled to all of the fund contributed, sought by negotiation to obtain the sum covered into the Supreme Lodge, and failing to obtain it, they bring this suit to compel its surrender to the court and its distribution among them.

The lodge contends that the relief asked was for the purpose of relieving the necessities of the class

of persons named in the distress call, resulting from the injuries received by the fall of the building; and the committee appointed for the purpose not only had a discretion as to how much of the fund contributed they would expend, but the proportion that each person was entitled to receive, and that the committee having, in good faith, settled both of these matters, their judgment is final and conclusive. Now, it must be remembered that the distress call did not fix definitely the number of killed and wounded. It was intended as an approximation only—more or less. If there had been more persons entitled to the relief, they would have been entitled to share in the whole fund contributed for that purpose. If less, it seems that they would also be entitled to the whole fund, unless the number entitled to the relief was so disproportionately less than the number estimated in the call, or their injuries so much less than estimated, as to amount to a mistake or fraud, which would entitle the donors to a return of at least a proportionate part of the money contributed. But there was no such mistake or fraud. The percentage below that estimate was not unreasonable.

After describing the accident and its effect, the call is made for contributions for the relief of the sufferers and their families. The call also states that the remittances will be turned over to the proper "committee for disbursement among the sufferers and their families in distress." Now, there was a particular class of persons described as having been killed or injured, and contribution was asked for the relief of them and their families, not to the common

charity fund of the lodge, but the appeal was direct-
ly in behalf of the sufferers and their families, and
the contributions were to be turned over to a com-
mittee, to be distributed among them.  The contri-
butions were not to the lodge, to be held by it and
distributed or not as it should see proper, but, as
said, to a named class of persons, to be distributed
among them by a committee, appointed by the lodge,
according to their necessities, caused by the injuries
received by the falling of the building.  The contri-
bution was made by strangers for the specific purpose
of relieving the necessities of a particular class of
persons, caused by extraordinary circumstances, and
it was entrusted to the appellant for that purpose, and
for that purpose alone.  It had no right to the fund
except for the particular purpose of distributing it
among the particular class, according to their necessi-
ties.  And in making the distribution the appellant
could not be controlled by a court of equity, for the
appellant was the trustee of an express trust for the
purpose of making the distribution, and if it acted
in good faith in making it, its judgment concluded all
parties concerned.  Niblack on Mutual Benefit Soci-
eties, sections 133 and 147, says, a court of equity
will not undertake to interpret a duty of the society,
or control it in distributing the money according to its
judgment and discretion, that its members have con-
tributed "to a common fund," to be applied to the
relief of its members when in sickness, want of em-
ployment or other disability.  See, also, Pulpress v.
M. E. African Church, 48 Pa. St., 209, and other
cases cited by appellant.

We agree that where contributions are made to the common fund of a society, or as a special fund, to be used in whole or in part by it at its discretion for the benefit of such members as it might select, or in such proportion as it might agree, a court of equity can not control its judgment, either as to the amount or as to the proportion of the donation among the members. But, as said, the contributors raised a fund and placed it in the hands of appellant as trustee for a specific purpose, and the trustee was not given the power to pay the money or withhold it, or a part of it, at its discretion, but the only discretion given it was the power to distribute it according to the necessities of the donees. It was trustee of an express trust for that purpose alone, and had no power to withhold any part of the fund from distribution, because it was not delegated to it. The money was held in trust for the benefit of the sufferers, which was to be distributed in proportion to their necessities arising from the injuries. The whole was contributed for their benefit, and they, as far as the appellant is concerned, are entitled to it. The contributors having before them a substantial account of the injuries caused by the falling of the building, contributed to the relief of the sufferers according to their inclinations, and appellant can not withhold it.

The general rule is, that in case of contributions for a specific purpose, the contributors may recover back the surplus. (See Niblack *supra*, section 150.) But in a case like this the contributions are made to relieve the necessities of sufferers, and the sum necessary for that purpose is to be estimated by the

contributors; and as the sum necessary for such purpose depends upon the opinion of each contributor, there can be no surplus, and the contributors can not recover back any part of their contributions, unless on the ground of mistake or fraud. But how can the appellant withhold it when there is no complaint by the con ributors? Its power as trustee does not extend that far.

Now, if A entrusts B with a sum to be distributed between C and D according to their necessities, B can not withhold a part of it upon the ground that the sum was more than their necessities required, because the nature of B's trust did not authorize him to make the inquiry; his only trust duty was to distribute the fund according to the necessities of C and D. The donor was the judge of the amount that he would give for that purpose. But it is said that the appellant can withhold such part of the fund for the benefit of the contributors, as it may deem the necessities of the donees do not require, and if they do not call for it, the appellant may keep it and use it for the benefit of the next cyclone sufferers or some other sufferers. Well, if the appellant can withhold a part of it, why not all of it, if it concludes that the condition of the donees does not require it. And if the donees complain, the appellant can say that, upon due deliberation, it concludes that they are entitled to no part of the fund, or that upon a close and careful calculation they are entitled to just three dollars and sixty-two and one-half cents, and the balance will be covered in the treasury for the benefit of the contributors, who are scattered all over the country, and

in all human probability will never call, but in that event the sum will be held for the benefit of the next sufferers. To allow this contention would open the door wide open to fraud. Its only duty was to distribute the money according to the equities of the donees.

The judgment is affirmed.